**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RONALD HITTLE, | No.22-15485 |
| *Plaintiff-Appellant*, | D.C. No. 2:12-cv-00766-TLN-KJN |
| v. | |
| CITY OF STOCKTON, California; ROBERT DEIS; LAURIE MONTES, | ORDER AND AMENDED OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Eastern District of California
Troy L. Nunley, District Judge, Presiding

Argued and Submitted March 27, 2023
San Francisco, California

Filed August 4, 2023
Amended May 17, 2024

Before: Ronald M. Gould and Sandra S. Ikuta, Circuit
Judges, and Edward R. Korman,[*] District Judge.

---

[*] The Honorable Edward R. Korman, United States District Judge for the
Eastern District of New York, sitting by designation.

Order;
Opinion by Judge Korman;
Dissent from Order by Judge Callahan;
Dissent from Order by Judge Ikuta;
Dissent from Order by Judge VanDyke

## SUMMARY[**]

### Employment Discrimination

The panel filed (1) an order amending the opinion filed on August 4, 2023, and denying a petition for panel rehearing and rehearing en banc; and (2) an amended opinion affirming the district court's summary judgment in favor of defendants in Ronald Hittle's employment discrimination action under Title VII and California's Fair Employment and Housing Act.

Hittle alleged that he was terminated from his position as Fire Chief for the City of Stockton based upon his religion and, specifically, his attendance at a religious leadership event.

In the amended opinion, the panel held that employment discrimination claims under Title VII and the California FEHA are analyzed under the *McDonnell Douglas* burden-shifting framework, under which the plaintiff must establish a prima facie case of discrimination by demonstrating that (1) he is a member of a protected class; (2) he was qualified

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged actions. Finally, the burden returns to the plaintiff to show that the proffered nondiscriminatory reason is pretextual. Alternatively, the plaintiff may establish a prima facie case of disparate treatment by showing direct or circumstantial evidence of discrimination. Hittle was required to show that his religion was "a motivating factor" in defendants' decision to fire him with respect to his federal claims, and that his religion was "a substantial motivating factor" with respect to his FEHA claims.

The panel concluded that Hittle failed to present sufficient direct evidence of discriminatory animus in defendants' statements and the City's notice of intent to remove him from City service. Hittle also failed to present sufficient specific and substantial circumstantial evidence of religious animus by defendants. The district court's grant of summary judgment in defendants' favor was appropriate where defendants' legitimate, non-discriminatory reasons for firing Hittle were sufficient to rebut his evidence of discrimination, and he failed to persuasively argue that these non-discriminatory reasons were pretextual.

Dissenting from the denial of rehearing en banc, Judge Callahan, joined by Judge VanDyke, wrote that she joined her dissenting colleagues' concern that the panel's opinion fails to follow the Supreme Court's directive prohibiting discrimination based on religion. She also feared that the panel's opinion would be read to foreclose claims of

discrimination for all protected classes because it gives only lip service to the Supreme Court's directive that, on summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.

Dissenting from the denial of rehearing en banc, Judge Ikuta, joined by Judges Callahan and R. Nelson, wrote that the panel's opinion is in tension with other Ninth Circuit Title VII cases, which have held that, as a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment.

Dissenting from the denial of rehearing en banc, Judge VanDyke, joined by Judge Callahan as to Parts I, II, III, and IV(A), wrote that Hittle produced ample evidence of the City's intent to discriminate, and that was enough to at least survive summary judgment. Judge VanDyke wrote that the panel abdicated its responsibility to read the record in the light most favorable to Hittle, allowed employers to escape liability for repeating discriminatory remarks simply by hiding behind those who say them first, and mangled Title VII's "motivating factor" analysis. Judge VanDyke also wrote that, in his view, the alternative reasons offered by the City were not legitimate or nondiscriminatory, but are instead further evidence of the City's discriminatory intent and rest on a misunderstanding of its obligations under the Establishment Clause based on the now-discredited endorsement test.

## COUNSEL

Elisabeth C. Butler (argued) and Aaron M. Streett, Baker Botts LLP, Houston, Texas; Alan J. Reinach and Jonathon Cherne, Church State Council, Westlake Village, California; Kelly J. Shackelford, Jeffrey C. Mateer, and David J. Hacker, First Liberty Institute, Plano, Texas; Stephanie N. Taub, First Liberty Institute, Cabot, Arkansas; Kayla A. Toney, First Liberty Institute, Washington, D.C.; for Plaintiff-Appellant.

Spencer J. Wilson (argued), Arthur A. Hartinger, Ryan P. McGinley-Stempel, and Geoffrey Spellberg, Renne Public Law Group, San Francisco, California; for Defendants-Appellees.

David H. Thompson and Joseph O. Masterman, Cooper & Kirk PLLC, Washington, D.C., for Amicus Curiae Global Leadership Network.

Christopher T. Holinger, Bradley J. Lingo and J. Alex Touchet, Robertson Center for Constitutional Law, Regent University School of Law, Virginia Beach, Virginia; for Amicus Curiae Robertson Center for Constitutinal Law.

Nicholas M. Bruno, Alyssa B. McDaniel, and Zachary T. Nelson, Beck Redden LLP, Houston, Texas; Sue Ghosh Stricklett, American Hindu Coalition, Sterling, Virginia; for Amici Curiae Sikh Coalition, Asma Uddin, Jewish Coalition for Religious Liberty, American Hindu Coalition, Coalition for Jewish Values, Islam and Religious Freedom Action Team, and Coalition of Virtue.

Matthew T. Martens, David M. Cook, and G. Edward Powell III, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for Amicus Curiae Samaritan's Purse.

## ORDER

The Opinion filed on August 4, 2023, is hereby amended. The amended opinion will be filed concurrently with this order.

Appellant filed a petition for panel rehearing and rehearing *en banc*. Dkt. 74. Judge Gould and Judge Korman voted to deny the petition for panel rehearing. Judge Gould voted to deny the petition for rehearing *en banc*, and Judge Korman so recommended. Judge Ikuta voted to grant the petition for panel rehearing and the petition for rehearing *en banc*. The full court was advised of the petition for rehearing *en banc*. A judge requested a vote on whether to rehear the matter *en banc*. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of *en banc* consideration. Fed. R. App. P. 35(a). Judge Owens recused himself and did not participate in the deliberations or vote. Appellant's petition for panel rehearing or rehearing *en banc*, Dkt. 74, is DENIED.

## OPINION

KORMAN, District Judge:

Plaintiff-Appellant Ronald Hittle ("Hittle") was an at-will employee of the City of Stockton, California (the "City") and served as the City's Fire Chief from 2005 through 2011. During his tenure, Hittle engaged in conduct that troubled his employer, and led ultimately to his termination. The City hired an outside independent investigator, Trudy Largent ("Largent"), to investigate various allegations of misconduct. In a 250-page report

referencing over 50 exhibits, Largent sustained almost all of the allegations of misconduct against Hittle.

Largent's Report specifically concluded that Hittle: (1) lacked effectiveness and judgment in his ongoing leadership of the Fire Department; (2) used City time and a City vehicle to attend a religious event, and approved on-duty attendance of other Fire Department managers to do the same; (3) failed to properly report his time off; (4) engaged in potential favoritism of certain Fire Department employees based on a financial conflict of interest not disclosed to the City; (5) endorsed a private consultant's business in violation of City policy; and (6) had potentially conflicting loyalties in his management role and responsibilities, including Hittle's relationship with the head of the local firefighters' union. Based on the independent findings and conclusions set forth in Largent's report, the City removed Hittle from his position as Fire Chief.

Hittle sued the City, former City Manager Robert Deis ("Deis"), and former Deputy City Manager Laurie Montes ("Montes") (jointly, "Defendants") claiming that his termination was in fact the result of unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and California's Fair Employment and Housing Act ("FEHA"). Hittle alleged that Deis and Montes terminated his employment as Fire Chief "based upon his religion." Specifically, Hittle alleges that he was fired for attending a religious leadership event.

On February 18, 2021, Defendants moved for summary judgment seeking dismissal of all of Hittle's claims. Hittle subsequently cross-moved for partial summary judgment as to his federal and state religious discrimination claims on April 1, 2021. On March 1, 2022, the district court denied

Hittle's motion and granted Defendants' motion as to all of Hittle's claims.  Hittle timely appealed.

## BACKGROUND

In deciding a motion for summary judgment, we view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Here, we recite the facts in the light most favorable to Hittle.  Hittle was the Fire Chief of the Stockton Fire Department during the period relevant to this appeal.  In that capacity, Hittle initially reported directly to Gordon Palmer, Stockton's City Manager.  After Palmer retired in 2009, Hittle began reporting directly to Montes, who had been appointed Deputy City Manager in 2008.

In May 2010, the City received an anonymous letter purporting to be from an employee of the Stockton Fire Department.  The letter described Hittle as a "corrupt, racist, lying, religious fanatic who should not be allowed to continue as the Fire Chief of Stockton."  In her subsequent affidavit in support of her motion for summary judgment, Montes stated that the source of this information was not an anonymous individual but a high-ranking Fire Department manager, who had told her that "Hittle favored members of that coalition—who all shared his Christian faith," and that her concern was that "Hittle was providing favorable treatment and assignments" to these other employees.  About one month after the City received this letter, Montes told Hittle in a meeting that she had "heard [he] was part of a group of folks, a Christian Coalition, and that [he] shouldn't be involved in that."  When Hittle stated that "[a]s a supervisor, you can't tell me I can't practice my faith when I'm off duty," Montes asked him about his "off duty

Christian activities." Hittle told her that "there was no Christian clique within the fire department that was meeting together, nor did she have any right to tell [Hittle] what [he] could or could not do with respect to [his] religion while off duty." According to Hittle, during this conversation, Montes said that Hittle should not "be a part of anything like that as the fire chief, and [he] should refrain from doing any of those types of activities" with other firefighters. Montes did not specifically explain what "those type of activities" comprised, but Hittle thought "the inference was the fact that I may have meetings with them, I might pray with them, I may have opportunity to speak to them about God, leadership in that respect." Hittle and Montes are in apparent agreement that Montes did not initiate the "Christian Coalition" term herself.

On July 1, 2020, Bob Deis became City Manager. At Hittle's and Deis's first meeting, Hittle expressed to Deis that he is "a religious man" and that he is "a Christian." Deis responded with "a blank stare, and there was a long pause." Deis's "body language and stare made [Hittle] very uncomfortable." Hittle felt that Deis's "coldness and rejection" was because Hittle had expressed that he was a Christian, and that Deis had heard about the anonymous letter and the "Christian Coalition." Hittle had the "distinct impression" that Deis's "mind was already made up about" Hittle.

In her oversight of Hittle, Montes became concerned about Hittle's performance as Fire Chief in other ways unrelated to Hittle's alleged religious favoritism. Specifically, Montes claimed that Hittle worked against the City's plans to cut public budget costs and expenses, unlike all of the other City Department heads during that time who were cooperating with the City Manager's office in an

ultimately unsuccessful effort to avoid the City declaring bankruptcy. As another example, in 2010, a proposition referred to as "Measure H" was slated for the ballot that November. Some members of the City's Fire Department opposed Measure H because they believed that it would undermine Fire Department autonomy and authority. In response, several off-duty firefighters visited nursing homes wearing their on-duty Fire Department clothing and told the residents that Measure H, if passed, would prevent the Fire Department from providing timely services to seniors in the event of an emergency. When the City Manager's office received complaints about on-duty firefighters advocating against Measure H, Deis and Montes raised the issue with Hittle. Montes claimed that Hittle agreed that the conduct was not acceptable but did not make an effort to stop it from occurring. Hittle disputes this allegation, and states that "Local 456 owned an antique fire engine that displayed a banner: 'Stockton Professional Firefighters,'" which had been used for many years for campaigning off-duty prior to the termination of Hittle, with no objection from management. The union used the antique fire truck without objection from Human Resources, Deis, or Montes for holidays and community events for many years and Hittle had not been disciplined for the union using the antique fire truck on off-duty time until 2010, when it was raised by Deis and Montes for the first time.

In light of these and other issues, including what Deis believed was Hittle's failure to "assure that proper decorum and ethical parameters were in place and enforced in his Department," Deis instructed Montes to continue directly supervising Hittle.

According to Montes, during the fall of 2010, due to what she "believed was a clear lack of leadership and

management skills displayed by Chief Hittle," Montes directed Hittle "to find and attend a leadership training program." Montes states that she specifically directed Hittle to "find a program intended for Fire Chiefs, or at least designed for the upper management of public entities," and was clear to Hittle that she wanted the leadership training to be related specifically to public sector service. Montes claims that she suggested to Hittle that the League of California Cities may provide such training, and that she was aware that the Federal Bureau of Investigation and the Post Officers Standards and Training offered upper management training programs to police departments through that group. Hittle stated that he reviewed various leadership training programs, but was unable to find any that were in California, or at a cost that the Fire Department could afford. Hittle subsequently was gifted four tickets to an event called the Global Leadership Summit (the "Summit"). The Summit was sponsored by a church, and its registration materials stated that: "The leadership summit exists to transform Christian leaders around the world with an injection of vision, skill Development and inspiration for the sake of the LOCAL CHURCH." However, according to a magazine article in the record, the Summit is a "pop-up business school" that "bring[s] a stellar faculty . . . to teach pastors and laypeople leadership and management." The Summit had "over 60,000 leaders . . . gather" and was "broadcast live . . . to more than 225 satellite sites across North America." Previous "speakers includ[ed] former President Bill Clinton, former Secretary of State Colin Powell, Jack Welch, and Carly Fiorina, former CEO of Hewitt-Packard." The same magazine referred to the Summit as "learning from the business world's best." Hittle explained that his "purpose in attending the leadership conference was to learn

leadership principles and enhance leadership skills that would assist [him] to lead the" fire department. Hittle also states that there was no policy that prohibited employees from attending religious programs while on duty. Along with three fellow firefighters, Hittle traveled in a City vehicle to Livermore, California to attend the Summit on August 5 and 6, 2010.

On September 3, 2010, the City received a second anonymous letter stating that Hittle and other fire department personnel had "attended a religious function on city time" using "a city vehicle." Deis asked Montes to evaluate the issues raised in the letter. According to Largent, Deis's "concern[] about Hittle attending this event on City time [was] that 'you cannot use public funds to attend religious events; even if under the guise of leadership development. It is not acceptable.'"

When Montes asked Hittle about the allegations in the second letter, Montes alleges that Hittle confirmed that he had attended the Summit on City time, accompanied by three City firefighters, that they used a City vehicle to travel to the Summit, and that they were paid their regular compensation during their attendance. Montes states that Hittle "continually insisted that although this Willow Creek Summit did contain a religious component, there were several business oriented non-religious speakers," and that he "defended his conduct claiming that this was appropriate leadership training."

Later, in a meeting with Hittle, Montes "again brought up the subject of there being a Christian Coalition in [Hittle's] department, and that these are the people [he] associate[s] with." Montes "told [Hittle] this wasn't good, and that [he] should not be doing this." She also told him he

should not have attended the leadership training. Hittle told Montes that the leadership training was the best he had ever attended, "there[ was] no Christian Coalition," and "she could not tell me I can't practice my religious faith, or with whom to associate." Hittle "asserted [his] right to associate with other Christians and told [Montes] she had no right to tell [him] what [he] could do on [his] own time to practice [his] faith." Hittle stated that Montes "raised her voice when accusing [him] of taking part in a Christian Coalition," and "[w]hen the term [']Christian Coalition['] was used by [Montes], it was clear [Montes] was saying it in a pejorative way, making it clear this was wrong and distasteful to her." "Montes did not accept [Hittle's] explanation" and continued to ask about Hittle's "religious activities including the [Summit]." This is the principal basis for Hittle's challenge to the adverse action against him.

Subsequently, on October 15, 2010, the Stockton Record reported that Hittle co-owned a vacation property with the Firefighters' Union President Dave Macedo ("Macedo"), Fire Marshal Matthew Duaime ("Duaime"), and retired Fire Captain Allen Anton. Montes claims that she learned of the conflict only after the newspaper article was published because Hittle had not previously disclosed this joint ownership to City officials. In Montes's view, this co-ownership raised questions about Hittle's impartiality with respect to "balancing the interests of the union and the taxpayers."

Montes issued a notice of a confidential investigation to Hittle on November 1, 2010 (identifying five issues) because of her perception that Hittle had "issues of non-cooperation and poor management practices." Montes stated that even after she issued the notice of investigation, Hittle continued to engage in conduct that she found troubling. For example,

Macedo (president of the fire department union) admitted to providing Health Insurance Portability and Accountability Act (HIPAA) protected information to the media in an attempt to influence San Joaquin County to permit City firefighters to provide advanced life support at emergency scenes. Montes claims that Hittle imposed only minor discipline on Macedo and defended Macedo's conduct, despite the fact that the leak resulted in the County suing the City and obtaining a preliminary injunction.

Montes also discovered that Duaime had falsified his time records in two ways. First, he had attended the Summit with Hittle. Second, he would work overtime and not submit a request for the incurred compensation, instead "saving" that time and improperly submitting a request for compensation on a day on which he had not worked overtime. Hittle defended Duaime's practices in a memorandum to Montes dated March 14, 2011, stating that Duaime had worked all the hours submitted, and had held accrued time off the books in order to avoid charging the City overtime. Montes alleges that Hittle refused to discipline Duaime until ordered to do so.

In addition, at this time, the City was in the midst of a fiscal crisis and on the verge of declaring bankruptcy, and Deis and Montes "instructed all Department Heads to prepare layoff plans in order to reduce costs which could potentially help avoid the bankruptcy." According to Montes, all Department Heads complied with this order except Hittle, who informed Montes that he could not agree to any layoffs or recommend a cut in staffing. As a result of Hittle's failure to follow this directive, Deis and Montes placed Hittle on administrative leave pending the outcome of the investigation that had been initiated the previous November.

On March 25, 2011, the City retained Trudy Largent, an outside investigator with human resources experience, to investigate Hittle's conduct. Largent interrogated Hittle at length regarding his Christianity and about the Summit. According to Hittle, the investigation was one-sided, because Largent did not investigate the nature of the leadership training provided by the Summit or contact the witnesses identified by Hittle. Hittle claims that Largent's "demeanor and approach clearly communicated her lack of impartiality."

On August 5, 2011, Largent submitted to the City her Confidential Investigation Report (the "Largent Report"), which totaled over 250 pages and referenced more than 50 exhibits. In Largent's interview with Montes, Montes negatively referred to Christians. Montes stated: "Incidentally when I told [Hittle] to go get some leadership training he asked if he [c]ould use George Liepart and I told him no, he's one of the church clique, and I said you know we need to get away from . . . you know going, going around the same mountain all the time." The Largent Report characterized Hittle's "use of City time and a City vehicle to attend a religious event" as the first "most serious act[] of misconduct." The Largent Report repeated the term "religious event" over 15 times, and stated that "it [was] clear that the primary mission of the Global Leadership Summit was to specifically provide for the benefit of those of a particular religion, Christianity." Indeed, the Largent Report makes clear that one of the key issues of the Fire Department's investigation was on "[w]hether the Global Leadership Summit was a religious event," and dedicated five pages to discussing its religious nature. In these pages, the Largent Report concluded that when Hittle "arrived at the Summit location . . . and observed where it was being

held [(a church)] this should have alerted Hittle that his participation and that of his managers would not be appropriate."

In the investigation of whether Hittle engaged in misconduct and violated City policy or Fire Department Procedures, the Largent Report made the following findings (in summary) as to each issue, and determined whether the City's allegations were sustained or not sustained:

1. The lack of effectiveness of Chief Hittle's ongoing supervision and leadership of the Fire Department, judgment as a department head, and his contributions to the management team; **"Sustained."**

2. Chief Hittle's failure to maintain proper discipline and order within the Department, contributing to a delay in investigating potential misconduct is **"Not Sustained."** The allegation that Hittle has delayed in making recommendations as to appropriate level of discipline; **"Sustained in part and Not Sustained in part."**

3. Use of City time and City vehicle by Chief Hittle to attend a religious event; his failure to properly report time off, and Hittle potentially approving on-duty attendance at a religious event by Fire Department managers; **"Sustained."**

4. Potential favoritism of employees by Chief Hittle and conflict of interest based on financial interest not disclosed to the City; **"Sustained."**

5. Apparent endorsement of [a] private consultant's business by Chief Hittle as an official of the City and potential conflict of interest by Hittle not disclosed to the City; **"Sustained."**

6. Failure by Chief Hittle to comply with management directions and his capability in respect to budget development; **[“]Not Sustained."**

7. Potentially conflicting loyalties by Chief Hittle in his management role, responsibilities, and his relationship with the Firefighters Local 456 Union; **"Sustained."**

After reviewing the Largent Report, Deis and Montes concluded that Chief Hittle should be removed from his position. In particular, Montes was concerned about the various findings that were sustained against Hittle in the Largent Report, and she and Deis did not believe that Hittle had provided them with any indication that he would attempt to correct his behavior or improve his management skills. Deis and Montes met with Hittle and offered to appoint Hittle to a Battalion Chief position so that he could remain at the fire department until he reached the retirement age of 50, to which he was relatively close at that time. Hittle did not accept this offer, and informed Deis and Montes that he intended to retain counsel and bring a lawsuit. Hittle stated that "Deis got very angry," "raising his voice and threaten[ing]" that if Hittle did not accept a demotion, he would face "a long expensive legal battle," and his "reputation would suffer irreparable harm."

On August 24, 2011, the City sent Hittle a notice of its intent to remove him from City service (the "Removal Notice") for the reasons stated in the Largent Report, which was attached, and which included the following detailed descriptions of its findings:

> 1) On August 5 and 6, 2010, you used City time and resources to attend a religious leadership event. This conduct violated City Manager Directive No. FIN-08 and Article C, Section 11 of the Fire Department Procedures Manual.
>
> 2) On August 5 and 6, 2010, you approved the attendance on City time of Deputy Chief Paul Willette, Division Chief Matt Duaime, and Fire Marshal Jonathan Smith at the same religious leadership event. This conduct violated City Manager Directive No. FIN-08 and Article C, Section 11 of the Fire Department Procedures Manual.
>
> 3) From 2004 through 2008, the City retained Integrated Services Group to provide consulting services to the fire department. At no time did you disclose to the City your personal relationship with the firm's owner, George Liepart, or the fact that the two of you were engaged in a project to build a church school. Nor did you properly investigate complaints that in 2005 Liepart solicited donations from fire department employees for the church school project. This conduct violated City policy against conduct adverse

to the welfare and/or good reputation of the City.

4) Despite receiving information in 2009 that the Integrated Services Group website contained an endorsement by you under a photograph of you in your Fire Chief uniform, you failed to investigate whether the information was true. This tacit endorsement of Liepart's firm violated City policy against conduct adverse to the welfare and/or good reputation of the City.

5) You failed to disclose to the City that you co-owned a cabin with Captain Dave Macedo, also President of International Association of Firefighters Local 456 (Union), and Division Chief Duaime. This violated your duty as a department head to disclose any actual or potential conflict of interest. Furthermore, this relationship raises questions as to why you failed to investigate Duaime's improper reporting of compensatory time on his timesheets for May and August 2010.

6) On March 29 and 30, 2011, you presented Deputy City Manager Laurie Montes with a Union proposal to put firefighters on a leave of absence instead of laying them off. This conduct was contrary to a department head's duty to further the goals and policies of the City.

7) Your failure to recommend appropriate discipline for misconduct by Captains Tony

Moudakis [for authorizing on-duty firefighters to assist his wife with a personal matter] and John Loverin [for falsifying dates on the Department's official pay records] violated Article 3, section 9 of the Fire Department Rules and Regulations, which requires you to "see that proper discipline is maintained."

8) After the Union released confidential patient information to the media in 2007, you failed to address the issue with employees to prevent a recurrence. When confidential patient information was again released by the Union on September 9, 2010 you failed to address preventative measures with employees. This conduct violated Article 3, section 9 of the Fire Department Rules and Regulations.

9) Between July 13, 2010 and October 2010 you failed to prevent members of the public from perceiving that firefighters were engaged in Union activities while on-duty. These activities included: wearing Union t-shirts that closely resembled official City firefighter shirts while riding on a fire engine owned by the Union; using City equipment to clean the Union hall while on-duty; and asking permission for on-duty personnel to set up for a Union-sponsored retirement dinner. This conduct raises doubts about your ability to be an effective department head and to further the goals and policies of the City.

10) In the fall of 2010, you told Fire Department Internal Affairs Investigator Mark Lujan that firefighters were "upset" with him for displaying a "Yes on Measure H" sign on his lawn. This conduct raises doubts about your ability to be an effective department head and to further the goals and policies of the City.

The City provided Hittle the opportunity to meet with a City official and respond to the notice of intent to terminate. On September 28, 2011, Hittle, joined by his attorney, met with then-Deputy City Manager Michael Locke and Assistant City Attorney Michael Roush. During that meeting, Hittle's attorney argued that the investigative report was not objective and that the meeting did not comport with due process. Hittle claims that the hearing was a sham, because he was not given an opportunity to call witnesses or obtain evidence and was locked out of his email system and files, and so had no opportunity to meaningfully defend himself. According to Locke, neither Hittle nor his attorney "provided any substantive reasons why [Hittle] should not be removed as Fire Chief." Following the meeting, Locke sent a memo to Deis stating that, based on his review of the Largent Report and its findings, and because Hittle had not refuted any of the findings, Locke recommended that Hittle be removed as Fire Chief. On September 30, 2011, the City sent Hittle a formal notice of separation from City service, removing Hittle from his position as Fire Chief effective as of October 3, 2011.

## STANDARD OF REVIEW

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). We review grants of summary judgment *de novo*. *Maner v. Dignity Health*, 9 F.4th 1114, 1119 (9th Cir. 2021). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact, and whether the district court correctly applied the relevant substantive law. *See Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*, 33 F.4th 1107, 1113 (9th Cir. 2022).

## DISCUSSION

We analyze employment discrimination claims under Title VII and the California FEHA using the *McDonnell Douglas Corp. v. Green* burden-shifting test. *See* 411 U.S. 792 (1973); *Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1145 (9th Cir. 2017) ("Because state and federal employment discrimination laws are similar, California courts apply the *McDonnell Douglas* burden-shifting framework to analyze disparate treatment claims under FEHA."). Under this framework, a plaintiff alleging that an employer engaged in discriminatory conduct adversely affecting plaintiff's employment must establish a *prima facie* case by demonstrating that: "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004). A plaintiff may demonstrate an inference of discrimination "through comparison to similarly situated individuals, *or* any other circumstances surrounding the adverse employment action

[that] give rise to an inference of discrimination." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (emphasis added) (internal quotation marks omitted). Similarly, California courts applying this test in the FEHA context have characterized the fourth element as a showing that "some other circumstance suggests discriminatory motive." *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 355 (2000).

Should the plaintiff set forth a *prima facie* case, the burden shifts to the defendant to articulate "a legitimate, nondiscriminatory reason for the challenged actions." *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1228 (9th Cir. 2021). If the defendant does so, the burden "returns to the plaintiff, who must show that the proffered nondiscriminatory reason is pretextual." *Id*. A plaintiff meets his or her burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Alternatively, a plaintiff can prevail merely by showing direct or circumstantial evidence of discrimination; he or she does not need to use the *McDonell Douglas* framework to establish a *prima facie* case. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (holding that a plaintiff "may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the employer). However, "[w]hether a plaintiff establishes her prima facie claim of disparate treatment using direct or circumstantial evidence or the *McDonnell Douglas* factors, 'once a prima face case of discrimination has been made, the burden shifts

to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action.'" *Opara v. Yellen*, 57 F. 4th 709, 723 (9th Cir. 2023) (cleaned up) (quoting *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009)). Moreover, "regardless of the approach a plaintiff takes . . . —i.e., establishing the prima facie case via direct or circumstantial evidence or the *McDonnell Douglas* factors—once an employer articulates some legitimate, nondiscriminatory reason for the challenged action, the employee must show that the articulated reason is pretextual." *Id.*

Under Title VII, the plaintiff need only "demonstrate[] that race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the [unlawful employment] practice." 42 U.S.C. § 2000e-2(m) (emphasis added). Thus, Hittle must demonstrate that his religion was "a motivating factor" in Defendants' decision to fire him with respect to his federal claims, *see id.*, and that his religion was "a substantial motivating factor" for his firing with respect to his FEHA claims, *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 232 (2013).

## 1

On summary judgment, direct evidence of discrimination is that which, "if believed, proves the fact [of discriminatory animus] without inference or presumption." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005).[1] We have concluded that derogatory comments made

---

[1] In a disparate treatment claim under Title VII, a plaintiff offering direct evidence of 'discriminatory animus' must show that "the defendant had

by a decisionmaker are "direct evidence of . . . discriminatory animus" and "can create an inference of discriminatory motive." *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997). Chief among Hittle's examples of direct evidence of discriminatory animus is Montes's reference to Hittle being part of a "Christian coalition," and Montes's and Deis's statements that Hittle was part of a "church clique" in the Fire Department. Montes responds to this characterization by noting that a high-ranking Fire Department manager had complained to her that there was a "Christian coalition" within the Fire Department, and that Hittle improperly favored members of that so-called coalition. Hittle acknowledged that the term "Christian coalition" came from the anonymous letters sent to the City criticizing Hittle's management of the Fire Department, and not from Montes herself.

Montes's comments—whether taken in the context of one conversation with Hittle or during Hittle's tenure as Fire Chief as a whole—do not constitute discriminatory animus. As previously observed, Hittle and Montes are in apparent agreement that Montes did not initiate the "Christian coalition" term herself, and that it originated from other members of the Fire Department who expressed unhappiness over Hittle allegedly engaging in favoritism. *Cf. Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003),

---

a discriminatory intent or motive," *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 986 (1988), to "treat[] some people less favorably than others because of their [protected characteristic]," *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). *See also Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1740 (2020) ("[A]n employer who intentionally treats a person worse because of [a protected characteristic] . . . discriminates against that person in violation of Title VII.").

*as amended* (Jan. 2, 2004) (finding no direct evidence of animus where discriminatory remarks were attributed to a non-decisionmaker employee). Montes's repetition of other persons' use of pejorative terms does not provide evidence of Montes's own animus, but rather shows concerns about other persons' perceptions. *See id.*; *cf. Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998), *as amended* (Aug. 11, 1998) (discussing that there is no direct evidence of animus if a remark would require an inference or presumption in an employee's favor). And although Hittle suggests that Montes engaged in discrimination by informing him that the City was not "permitted to further religious activities" or "favor one religion over another," these observations do not constitute direct evidence of discrimination. Rather, they reflect Montes's legitimate concern that the City could violate constitutional prohibitions and face liability if it is seen to engage in favoritism with certain employees because they happen to be members of a particular religion. *See Noyes v. Kelly Servs.*, 488 F.3d 1163, 1172 (9th Cir. 2007) (concluding that a fact finder could reasonably determine that an employer engaged in discrimination by promoting employees because they were members of a certain religion); *cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2417 (2018) ("[T]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)) (internal quotation marks omitted)). In short, because Montes and Deis did not use derogatory terms to express their own views, or focus on the religious aspect of Hittle's misconduct to express their own animus, but rather referenced other legitimate constitutional and business concerns, their terminology does not give rise to a genuine issue of discriminatory animus.

*See Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085–86 (5th Cir. 1994) (per curiam) (indicating that where remarks had an innocent explanation, they were not evidence of gender discrimination).

Hittle also claims that the Removal Notice issued by the City demonstrates direct evidence of discrimination because of its repeated references to Hittle's attendance at a "religious event" (*i.e.*, the Summit) and his approval of other Fire Department employees to attend. But this does not suggest discrimination, because the undisputed record shows that the Removal Notice relied on the findings in the Largent Report, which concluded that Hittle engaged in misconduct by attending a two-day event that did not benefit the City because it was not the sort of leadership conference aimed at public sector leadership, all while on paid City time, and approving three others to do likewise. In other words, the references to Hittle's misconduct by attending the Summit are due to a legitimate non-discriminatory reason—lack of benefit to the City—rather than to religious animus. It is undisputed that the Summit, even if a "pop-up business school," did not constitute the type of upper management public sector leadership training that Montes directed Hittle to seek out, as it did not provide any focus on the management of public agencies. Montes and Deis could conclude (whether correctly or incorrectly) that the skills that the Summit sought to impart were not of any value or relevance to the three other firefighters whom Hittle invited to attend the event with him, all of whom also participated while on City time. Such a view is supported by the registration materials for the Summit, stating that the purpose of the leadership summit was to benefit the local church. An employer's conclusion that an activity does not benefit the employer is not discriminatory even if the activity

has some relationship to a protected characteristic, such as religion or race.  *See Davis*, 14 F.3d at 1085–86; *see also Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir. 1995) ("The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment.").  "We cannot infer [religious] discrimination based on factual allegations that are 'just as much in line with' the non-discriminatory explanation we have identified." *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 276 (1st Cir. 2022) (citation omitted).  Where there are "obvious alternative explanations for the purportedly unlawful conduct and the purposeful invidious discrimination plaintiff asks us to infer, discrimination is not a plausible conclusion." *Id.* (cleaned up) (citation and internal quotations omitted).

Because the employer could discipline Hittle for attending an event of no benefit to the City (the "obvious alternative explanation" for identifying the Summit as problematic), the employer's discipline of two of the other Fire Department employees who attended the Summit with Hittle—both of whom were also Christian—by "forfeit[ing] two days of vacation to reimburse the City for the time spent attending the leadership conference," is also not discriminatory on the basis of religion.[2]  More important, Hittle did not point to similarly situated people who attended events of no benefit to the City who were not disciplined, and so did not establish that part of his prima facie case.

Finally, Hittle contends that Deis's declaration in support of Defendants' motion for summary judgment contains statements that are proof of Deis's animus towards

---

[2] Paul Willette, the third member of the Fire Department to attend the Summit with Hittle, retired prior to the issuance of the Largent Report.

Hittle's religion. Deis describes Hittle's attendance at the Summit as exercising "poor judgment," and that Hittle engaged in an "inappropriate activity" that was simply "for [Hittle's] own personal interests." But, as discussed above, Deis, like Montes, had legitimate, non-discriminatory reasons to be critical of Hittle inappropriately using City resources to attend an event for his personal benefit, and inviting other City personnel to do the same.[3]

Nothing in our case law compels a different result. Hittle cites to *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005), *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1128 (9th Cir. 2000), and *Cordova*, 124 F.3d at 1149, in arguing that, in this Circuit, "a single discriminatory comment is sufficient to preclude summary judgment for the employer." The decisionmakers in those cases made "clearly sexist, racist, or similarly discriminatory statements or actions by the employer" related to protected characteristics of the employee. *Coghlan*, 413 F.3d at 1095. In *Dominguez-Curry*, plaintiff was told by a decisionmaker that "women have no business in construction," and that "women should only be in subservient positions," 424 F.3d at 1031; in *Chuang*, a decisionmaker remarked at a meeting that "'two Chinks' in the department were more than enough," 225 F.3d at 1121; and in *Cordova*, the decisionmaker referred to a non-plaintiff employee as a "dumb Mexican." 124 F.3d at 1147. None of

---

[3] Nor does Hittle provide evidence of discrimination—direct or otherwise—by describing a subjective and self-serving "long pause" and Deis's "blank stare" during their first meeting after Hittle mentioned to Deis that he was a Christian. *See, e.g.*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam) ("[I]solated incidents (unless extremely serious) will not amount to discriminat[ion]." (citation omitted)).

these cases are comparable to this case, where the decisionmaker was making what could only be described as reasonable inquiries based on allegations of misconduct that she had concededly received from others in language comparable to what they used. We are not prepared to hold that such an inquiry constitutes evidence of direct discrimination specifically or discrimination generally.

Even if the quoted remarks are perceived as pejorative by Hittle, our precedent does not dictate a contrary result. The statements by Montes and Deis are more akin to "stray remarks that have been held insufficient to establish discrimination." *Cordova*, 124 F.3d at 1149. And this evidence falls within the ambit of circumstantial evidence that requires an additional logical leap that is not supported by the record here. *See Coghlan*, 413 F.3d at 1095-96 (discussing the difference between direct and circumstantial evidence, with circumstantial evidence requiring "specific and substantial" evidence to defeat summary judgment). Therefore, discriminatory remarks made by a decisionmaker must be "clearly sexist, racist, or similarly discriminatory" to create an inference of discriminatory motive. Here, the decisionmaker was merely conducting an inquiry based on complaints by third parties and the "obvious alternative explanation," *Frith*, 38 F.4th at 276, for using those pejorative terms was that the decisionmaker was quoting the third parties.

Finally, because neither Montes nor Deis made any remarks demonstrating their own discriminatory animus toward religion—i.e., an intent to treat Hittle worse because he is Christian—but focused on the Summit's lack of benefit to the City and other evidence of Hittle's misconduct, Hittle failed to demonstrate that discriminatory animus toward religion was even a motivating factor in his termination.

**2**

On summary judgment, circumstantial evidence of discrimination "must be 'specific' and 'substantial.'" *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015) (citation omitted), *as amended on reh'g* (Oct. 14, 2015). Hittle merely offers conclusory and unsupported examples of circumstantial evidence of religious animus by Defendants.

Hittle alleges that on the day he received the notice of investigation from the City, he met with Deis, who angrily threatened Hittle to accept a demotion or face a long, expensive legal battle in which Hittle's reputation would suffer irreparable harm. Viewing Hittle's account of this meeting in the light most favorable to him still does not suggest any reasonable inference of religious animus, because there is no evidence in the record that Hittle's religion was discussed during this meeting.

Nor does the timing of Hittle being placed on administrative leave raise a showing of religious animus. As noted above, Hittle was placed on leave on March 30, 2011, shortly after the City retained Largent to conduct the investigation. Hittle claims that this decision was a result of an article published in a local newspaper on March 25, 2011, stating that Hittle had attended the Summit and noting its religious nature. But at the time Hittle was placed on leave, he had already been on notice for almost five months that he was under investigation for actions relating to attending the Summit and other misconduct. During this time, the record is replete with evidence that, despite knowledge of the City's impending investigation, Hittle continued to engage in conduct that was of serious concern to the City, including defending Union President Macedo's leak of confidential

HIPAA data, refusing to discipline Duaime for improper overtime practices, and refusing to prepare a layoff plan or recommend staffing cuts for the Fire Department during the City's fiscal crisis, in spite of directives from Deis and Montes to do so—the latter two issues both memorialized in memoranda prepared by Hittle and sent to Montes on March 14, and 16, respectively. In short, Hittle fails to raise specific or substantial facts regarding the timing of his being placed on administrative leave that reasonably link that event to the article noting Hittle's attendance at the Summit, let alone evidence of religious discrimination by Defendants.

Hittle also contends that certain findings in the Largent Report present evidence of pretext because the investigation deemed as "not sustained" certain instances of Hittle's misconduct alleged by the City. But the fact that the Largent Report sustained the findings relating to misconduct in attending the Summit but did not sustain the City's allegations as to a few of the investigation's numerous issues does not show that the other allegations were pretexts and the real reason was discriminatory animus toward religion. Moreover, the Largent Report itself explains that issues deemed "not sustained" indicates that the "investigation disclose[d] that there was insufficient evidence to sustain the complaint *or* fully exonerate the employee" (emphasis added), as opposed to concluding that the issue was "unfounded" (meaning that the "investigation disclose[d] that the alleged act(s) did not occur or did not involve department personnel"), or "exonerat[ing]" Hittle on the issue (meaning that the "investigation disclose[d] that the alleged act occurred, but that the act was justified, lawful, and/or proper"). More significantly, Largent Report sustained what it characterized as the "most serious acts of misconduct" committed by Hittle, namely Hittle's

inappropriate use of City time and a City vehicle to attend the Summit (which it characterized as a religious event) and Hittle's failure to disclose his personal relationships and corresponding financial interests with respect to George Liepart and Union President Macedo.

Simply put, the summary judgment record does not contain evidence to raise genuine issues of material fact sufficient for Hittle to meet his burden to demonstrate that Defendants' legitimate non-discriminatory reasons for firing him were mere pretext for religious discrimination. Even though an aspect of Largent's Report and the notice terminating Hittle was the religious nature of the leadership event, a nexus to a protected characteristic is not enough to preclude summary judgment for the employer. There is no genuine issue of material fact that Montes and Deis were motivated by discriminatory animus toward religion, as opposed to concern about the perception of others. And the facts that Hittle identifies as circumstantial evidence of discriminatory pretext are neither specific nor substantial enough to support a finding of unlawful employment discrimination.

### 3

As Defendants observe, in addition to Hittle's improper attendance at the Summit as one justification for removing him from City service, the City "articulated an overwhelming number of [other] non-discriminatory reasons for terminating Hittle's employment, which were independently verified by an outside investigator."

Hittle's *post hoc* effort to cast the findings of misconduct in the Largent Report as mere pretext for discriminatory termination is unsupported by the record. For example, Hittle claims that he had discussed his co-ownership of the

vacation cabin with a City attorney, who advised him that he did not need to disclose it to the City. But the record is clear that Hittle did not inform Largent about this conversation during her investigation, and in his interview with Largent, nor did he do so when he and his attorney were given the opportunity at his pre-termination meeting on September 28, 2011. Hittle stated that he did not disclose to the City that he was a co-owner of the cabin, together with three other Fire Department officials, because he did not see a conflict of interest.

Nor does Hittle persuasively argue that the City's identification of his improper endorsement of Liepart's consulting business was pretextual. Hittle claims that the City did not have a specific policy prohibiting such an endorsement, but Hittle told Largent in an interview that he understood it was City practice for its officials to not endorse private businesses. And, as Defendants observe in their brief, an employer does not need to identify a specific policy violation to fire an at-will employee. *See Guz*, 24 Cal. 4th at 351–53.

Hittle is no more successful in providing summary criticism of the allegations that he did not cooperate with the City during its financial crisis, promoted union interests at the expense of City welfare, and failed to discipline firefighters for misconduct. And, even viewing these facts in the light most favorable to Hittle, it is not sufficient for a plaintiff on summary judgment to merely "show the employer's [termination] decision was wrong, mistaken, or unwise." *Dep't of Fair Emp. & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 746 (9th Cir. 2011) (quoting *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 75 (2000)).

Similarly, Hittle's challenging various findings in the Largent Report as "unfounded" (or downplaying their seriousness) is insufficient to raise a triable issue of fact as to pretext. In this respect, Hittle is simply offering his own subjective viewpoint as to his ability to effectively manage the Fire Department, but "an employee's subjective personal judgments of [his] competence alone do not raise a genuine issue of material fact." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996); *accord Buhl v. Abbott Labs.*, 817 F. App'x 408, 410–11 (9th Cir. 2020) (memorandum disposition) (noting that "technical disagreements" with a manager and plaintiff's "own subjective belief that [his employer's] concerns about his performance were overblown are insufficient to raise a genuine issue of fact").

**4**

Because Hittle has not met his burden to overcome Defendants' motion for summary judgment on his affirmative discrimination claim, Hittle's claim for the City's failure to prevent discrimination in violation of Cal. Gov't Code § 12940(k) likewise fails. There is no stated claim for failure to prevent discrimination if no discrimination occurred. *See Trujillo v. N. Cty. Transit Dist.*, 63 Cal. App. 4th 280, 288–89 (1998) (holding that the statutory language of § 12940 does not "support[] recovery on . . . a private right of action where there has been a specific factual finding that [the alleged] discrimination or harassment actually occurred at the plaintiffs's workplace").

**CONCLUSION**

To summarize, we hold that, based on the record before us, the district court's granting of summary judgment in Defendants' favor was appropriate where Defendants'

legitimate, non-discriminatory reasons for firing Hittle were, in sum, sufficient to rebut Hittle's evidence of discrimination, and Hittle has failed to persuasively argue that these non-discriminatory reasons were pretextual. When discriminatory remarks are merely quoting third parties and the real issue is public perception or other forms of misconduct (such as engaging in an activity that does not benefit the employer), there is no genuine issue of material fact that the employer was discriminatory. For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

CALLAHAN, Circuit Judge, with whom Judge VANDYKE joins, dissenting from the denial of rehearing en banc:

I join my dissenting colleagues' concern that the panel's opinion fails to follow the Supreme Court's directive prohibiting discrimination based on religion. Accordingly, I join Judge Ikuta's dissent and sections I, II, III, and IV (A) of Judge VanDyke's dissent.

In addition, I fear that the panel's opinion will be read to foreclose claims of discrimination for *all* protected classes because our court continues to give lip service to the Supreme Court directive that we view evidence in the light most favorable to the nonmoving party. It is the province of the jury, and not judges, to decide disputed issues of fact. *Tolan v. Cotton*, 572 U.S. 650 at 651, 656 (2014). That did not happen here. Title VII actions will never be properly determined by juries if judges grant summary judgments by crediting employers' allegedly "nondiscriminatory" termination reasons instead of viewing the facts in favor of the employees alleging discrimination. A plaintiff needs to only produce "very little" evidence of the employer's

discriminatory intent to move past summary judgment. *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1128 (9th Cir. 2000). Even if the panel's approach to religious discrimination were correct—which it is not—the burden of production was met here, so this case should have proceeded to a jury.

IKUTA, Circuit Judge, joined by CALLAHAN and R. NELSON, Circuit Judges, dissenting from denial of rehearing en banc:

In this case, we affirmed the district court's decision granting summary judgment to the City of Stockton because Ronald Hittle's evidence of a discriminatory motive was insufficient to create a genuine issue of material fact. I joined the opinion, but also voted in favor of rehearing this case en banc because our conclusion is in tension with other Ninth Circuit Title VII cases which have held that "[a]s a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000); *see also Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005) ("[W]e have repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer."). In my view, we should have taken this case en banc to correct this dilution of the summary judgment standard. Our failure to do so in this case, however, does not mean that employers are entitled to a more generous summary judgment standard

when they engage in discrimination on the basis of religion than when they engage in other sorts of discrimination.

---

VANDYKE, Circuit Judge, joined by CALLAHAN, Circuit Judge, as to Parts I, II, III, and IV(A), dissenting from the denial of rehearing en banc:

Consider this story:  A city receives an anonymous letter about its police chief—a lesbian and a multi-decade veteran of the force—accusing her of being a "lying, corrupt, radical gender ideologue and LGBTQ fanatic."  Some of her coworkers regularly employ such language to criticize her and other gay and lesbian officers in the precinct, calling them things like "the lesbian clique" and "the Rainbow Coalition."

After a change in city leadership, she is called into her supervisor's office.  One might hope that her supervisor scheduled the meeting to express concern about the inappropriate rhetoric.  Instead, the supervisor admonishes the chief for being part of the "Rainbow Coalition."  The supervisor repeats that derogatory term (and others), telling the chief that "this wasn't good" and she "shouldn't be involved in that."  The chief's perceived affiliation with the "Rainbow Coalition" is not the only source of friction between her and her supervisor, who suggests the chief should seek out some leadership training.

The city is broke, so it can't pay for any such training.  But at this point, the chief benefits from a stroke of good luck.  In just a few weeks, a prominent national leadership summit will be held within driving distance of the city.  Though it does not cater exclusively to the LGBTQ community, the summit is hosted by a gay-rights advocacy

group, and its mission is "to transform gay and lesbian leaders for the sake of the LGBTQ community." The chief attends the summit with other police officers from her precinct, all of whom are gay or lesbian. She drives the group there in her work vehicle. The group does not take time off from work, which is standard practice for such training, but each officer pays for their own ticket.

After the summit, the police chief is again called into her supervisor's office and presented with another anonymous letter. This one faults her for "using a <u>city vehicle</u> and attending an <u>LGBTQ function on city time</u>," which the letter labels a "gross misuse of city finances." Her supervisor again expresses deep concern with the chief, angrily accusing her of being part of this so-called "Rainbow Coalition." The relationship deteriorates, and the city opens an investigation. The investigator's report criticizes the LGBTQ-centric identity of the leadership training no less than ten times and labels the chief's attendance as one of her "most serious acts of misconduct."

The chief is fired. During the litigation that follows, her supervisors devise numerous, contradictory explanations for the decision. The explanations include legally incorrect statements like "the city is legally prohibited from contributing to or participating in activities in furtherance of the LGBTQ community" and outright discriminatory statements like "the LGBTQ-centric mission of the summit means that it is of no value to the City."

Does this sound like the firing was based, at least in part, on the police chief's sexual orientation? If so, read on. I'm willing to bet that you'll likewise conclude that the City of Stockton has discriminated against its former fire chief, Ronald Hittle, because of his religion.

Like the hypothetical employer described above, the City of Stockton's management frequently parroted derogatory and insulting terms coined by others to criticize Chief Hittle's Christian faith.  Although they now say they did so under the guise of "show[ing] concerns about other persons' perceptions," *Hittle v. City of Stockton*, 76 F.4th 877, 888 (9th Cir. 2023), the Supreme Court has already rejected "a 'modified heckler's veto, in which … religious activity can be proscribed' based on 'perceptions' or 'discomfort.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001)).

The discriminatory conduct did not end there.  Hittle's direct supervisor, Laurie Montes, admitted on the record that in her view, Hittle's attendance at the Global Leadership Summit—a national Christian leadership training program—provided no benefit to the City for the *precise* reason that the Summit provided leadership training from a Christian worldview.  But the Supreme Court has long held that singling out religious viewpoints simply because they are religious is per se discriminatory and risks "fostering a pervasive bias or hostility to religion." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 846 (1995).

Finally, both Montes and the City Manager, Bob Deis, opined that Hittle was wrong to attend the Global Leadership Summit "because the City is not permitted to further religious activities."  This explanation "rest[s] on a mistaken view that it had a duty to ferret out and suppress religious observances." *Kennedy*, 597 U.S. at 544.  If such logic had any remaining purchase before *Kennedy*, it certainly shouldn't have had any now.  But notwithstanding the Supreme Court's repeated attempts to rid our Establishment

Clause jurisprudence of the endorsement test, it apparently lives on in the Ninth Circuit.

Does anyone seriously doubt that if the plaintiff in this case were as described in the initial hypothetical above, this court would have failed to rehear this case en banc?  Hittle produced ample evidence of the City's intent to discriminate, and under this court's caselaw, that is enough to *at least* survive the summary judgment stage. *See Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1150 (9th Cir. 1997).  It's difficult to explain the difference in treatment here by anything other than a continued willingness to permit "purg[ing] from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious." *Kennedy*, 597 U.S. at 535.

In its stubborn insistence on ruling against Chief Hittle, the panel has twisted the record into knots and badly misstated Title VII law.  Its decision (1) abdicates its responsibility to read the record in the light most favorable to Hittle at the summary judgment stage; (2) allows employers to escape liability for repeating discriminatory remarks simply by hiding behind those who say them first; and (3) mangles Title VII's "motivating factor" analysis. Perhaps most glaringly, its original opinion also incorrectly heightened the showing a plaintiff is required to make to demonstrate disparate treatment.  In the panel's view, Hittle bore the burden of showing that the City's discriminatory conduct was "motivated by religious hostility," *Hittle*, 76 F.4th at 892, notwithstanding the Supreme Court's admonition that such a plaintiff need only show he was "*intentionally* treat[ed] … worse because of" a protected characteristic, *Bostock v. Clayton County*, 590 U.S. 655, 658 (2020) (emphasis added).

Recognizing at least this last mistake, the panel's amended opinion retires its former use of the word "hostility," replacing it with the more accurate (but less specific) "discriminatory animus." Not only do those changes not fully fix the original opinion's legal errors, but they also put the panel, which apparently remains as determined as ever to rule against Hittle, in a pickle. Notwithstanding its many other errors, the original opinion correctly acknowledged that the "gravamen" of the "notice terminating Hittle was the *religious* nature of the leadership event." *Hittle*, 76 F.4th at 892. But if attendance at a religious event was the "gravamen" of the firing and Hittle need only show that he was "intentionally treat[ed] … worse because of" religion, *Bostock*, 590 U.S. at 658, it would seem the panel would have no choice but to reverse its previous decision in favor of the City.

But it won't. Instead of simply accepting the inevitable effect of its prior errors and ruling for Hittle, the panel attempts to quietly paper over them by revising its view of the underlying facts. Now we are told that the "religious nature of the leadership event" was merely an "aspect" of Hittle's firing, not its "gravamen." One might reasonably expect some kind of explanation for the panel's convenient revelation on this dispositive issue of fact, but none is forthcoming. This willingness to improperly reinvent the facts of this case against Hittle to justify a past outcome is not a good look for our court—particularly when we have a well-established obligation to read the facts in Hittle's *favor* at this stage of the case.

In short, the panel's modifications in the amended opinion merely attempt to hide meaningful changes to the logic of its decision behind a few unassuming and unhelpful changes in verbiage. The amended opinion twists the record

into even worse knots to reach an obviously wrong conclusion, and it continues to badly misstate both religious liberty and Title VII caselaw. These errors will not be without consequences, and ironically, many of those consequences will be felt by members of protected classes other than Christians like Chief Hittle—including women and racial, religious, and sexual minorities (unless our court *sub silentio* applies two different standards). We should have reheard this case en banc to bring it in line with the Supreme Court's religion precedents, set the record straight, and undo the damage it has done to our Title VII caselaw. I respectfully dissent.

## I.

In Title VII cases, "we begin, not surprisingly, with the text of the statute." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003). Under Title VII, it is "an unlawful employment practice for an employer … to discriminate against any individual … because of such individual's … religion." 42 U.S.C. § 2000e-2(a)(1). "[A]n unlawful employment practice is established when … religion … was *a motivating factor* for any employment practice, even though other acts also motivated that practice." *Id.* § 2000e-2(m) (emphasis added). Religion is defined broadly to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

This court usually analyzes discrimination claims using the burden-shifting standard laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). But "nothing compels the parties to invoke" *McDonnell Douglas*, which is just "a useful tool to assist plaintiffs at the summary judgment stage." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122

(9th Cir. 2004) (citation and internal quotation marks omitted). "[A]lternatively," a plaintiff "may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the discrimination. *Id*. That is what Hittle did here. "[D]iscriminatory remarks … create a strong inference of intentional discrimination," *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1180 (9th Cir. 1998), and Title VII plaintiffs are usually "required to produce 'very little' direct evidence of the employer's discriminatory intent to move past summary judgment." *Chuang v. Univ. of Cal. Davis, Bd. of Trs*., 225 F.3d 1115, 1128 (9th Cir. 2000) (citation omitted).

After a plaintiff has adduced such evidence, "the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for its employment decision." *Cordova*, 124 F.3d at 1148. But when a plaintiff introduces "direct or circumstantial evidence of discriminatory intent, he will *necessarily* have raised a genuine issue of material fact with respect to the legitimacy or bona fides of the employer's articulated reason for its employment decision." *Id.* at 1150 (9th Cir. 1997) (citation omitted). Such a plaintiff will therefore have at least satisfied his summary judgment burden.

As explained below, this record includes ample direct and circumstantial evidence of Montes's and Deis's discriminatory intent, which the panel should have recognized as more than sufficient to meet Hittle's burden at the summary judgment stage. It did not do so because, though it recognized its obligation to "view the evidence in the light most favorable to the non-moving party," *Hittle*, 76 F.4th at 880, it abandoned that duty wholesale. Its recounting of the facts focused at length on disputed facts

favoring the City, repeatedly credited the City's version of events over Hittle's, and ignored other undisputed facts favoring Hittle. To set the record straight—and to recount the significant evidence of discriminatory intent that Hittle's supervisors displayed toward his religion—the following background states the facts in the light most favorable to Hittle, as our standard of review requires.

## II.

## A.

At the time he was fired, Hittle served as the Chief of the Stockton Fire Department. He reported directly to Montes, a deputy city manager, and finally to Deis, the City Manager. In May 2010, the City received an anonymous letter criticizing Hittle's performance, and accusing him of being a "religious fanatic." The City had received similar letters in the past, but a prior City Manager had a written policy against investigating them.

Montes and Deis took a different tack. During a meeting with Hittle, Montes told him that "she heard [he] was part of a group of folks, a Christian Coalition." Montes did not bring up the "Christian Coalition" to sympathize with the discriminatory remarks Hittle was facing. Instead, she admonished him that he "shouldn't be a part of anything like that as the fire chief" and "should refrain from doing any of those types of activities." Though Montes did not say what types of "activities" were disallowed, Hittle understandably took her to mean that she did not want him "pray[ing] with" any of his firefighters or "speak[ing] to them about God."

Though the provenance of the term "Christian Coalition" is unknown, it is at least clear that the moniker was pejorative. Another firefighter in the department explained

that he "began to hear firehouse chatter about the Bible Thumpers, or the Christian Coalition." "Within the department," he explained, "people are always trying to lump you into a group and make fun of you. The term was not intended to be complimentary." Despite its negative connotation, Montes used the term in reference to Hittle several times. In his first meeting with Deis, Hittle deduced from Deis's cold demeanor that Deis had prejudged him, having "already seen the anonymous letter and heard from Montes about [his] being part of a Christian Coalition."

To be sure, the statements about the supposed "Christian Coalition" were not the only source of friction between Hittle and his superiors. As the panel opinion labors mightily to recount, city management also expressed concern about other aspects of Hittle's job performance. *See Hittle*, 76 F.4th at 881–82. Though many of these concerns were eventually listed as bases for his termination alongside the allegations pertaining to religion, the religious allegations were listed first and featured prominently in the City's reasoning and thus could accurately be described as "the gravamen" of the report that led to Hittle's firing. Indeed, in its original opinion, the panel expressly adopted this characterization. *Hittle*, 76 F.4th at 892. But in the panel's amended opinion it has inexplicably downgraded the religious allegations to a mere "aspect" of the report. The panel provides no explanation for its revision. But one thing is for sure: it was right the first time.

At least in part because of these perceived faults, Montes advised Hittle to obtain leadership training. The parties hotly contest the details of this request. While Montes contends that she "*directed* that [Hittle] find and attend a leadership training program," suggesting a mandate, Hittle disagrees, asserting that Montes only "recommended" and

"encouraged" him to do so.  Not only do the parties dispute the extent to which such training was mandated, they also bicker about the specific kind of training Montes asked Hittle to obtain.  Montes testified that she "very specifically directed that he find a program intended for Fire Chiefs, or at least designed for the upper management of public entities."  But on this point, too, Hittle tells a different story.  When specifically asked whether Montes "wanted [him] to attend fire leadership training," Hittle responded only that she "wanted [him] to attend leadership training."  Then, when asked a follow-up question about whether "she wanted you to attend leadership training similar to what the police officers did," Hittle again disagreed, saying, "Yeah.  She was—no, it was more of a surprise that they didn't provide or there was no mandate … to have continuing education."  Notwithstanding its obligation to do the opposite at the summary judgment stage, the panel wrongly credited Montes's testimony on these disputed issues over Hittle's. *Id.* at 882.[1]

At the time Montes encouraged Hittle to attend a training, Stockton faced a severe budget crisis that would eventually lead to its bankruptcy.  Because the budget was tight, Hittle found it difficult to secure a training option like the ones he had attended in the past.  While Hittle was struggling to find affordable options, he learned that an annual faith-based leadership conference, the Global Leadership Summit, was being held in a nearby city.

There is no dispute that the Summit is religiously affiliated.  It "exists to transform Christian leaders around

---

[1] Worse, it used its resolution of this factual dispute in the City's favor to resolve a key legal issue in the case against Hittle.  *See id.* at 889.  More on that later.

the world with an injection of vision, skill, development and inspiration for the sake of the local church." It was held at a church and attended by many pastors, and it intentionally weaves both religious and secular content into its programming. The Summit's speakers typically include pastors, famous business leaders, politicians, and authors.[2]

Hittle attended the Summit alongside three other Fire Department leaders. Each attendee paid their own way to the conference, and the only costs incurred by the City were the use of Hittle's work vehicle and the regular salaries of the employees for their two days of attendance. None of the employees took leave to attend the conference, and each "still took all [their] emails and all [their] phone calls." While there, the group noticed another fire chief in attendance and wearing his uniform.

After the Summit, the City received a second anonymous letter complaining that Hittle "used a city vehicle and attended a religious function on city time," which the letter characterized as "a gross misuse of city finances." In response, Montes again invoked the specter of the "Christian Coalition," telling Hittle that his perceived participation in it "wasn't good, and that [he] should not be doing this." Hittle described their conversation as "very heated"—"the angriest argument the two of us ever had." Montes "raised her voice," and "it was clear she was saying [the term 'Christian

---

[2] In addition, the Global Leadership Summit has submitted an amicus brief supporting Hittle that elaborates on its Christian affiliation. In the brief, the Summit describes itself as "a faith-based organization," and it considers its Christian character to be one of its great strengths. In its view, "the Summit is a valuable resource to leaders in all areas … because, not despite … [its] moral foundations."

Coalition'] in a pejorative way, making it clear this was wrong and distasteful to her."

The City then opened a lengthy misconduct inquiry into Hittle that closely scrutinized his religious affiliations and his attendance at the Summit.  During the investigation, Deis expressed his view that "[i]t is not acceptable" to "use public funds to attend religious events; even if under the guise of leadership development," and Montes averred that the Summit's purpose to "transform Christian leaders" did not "provide 'a specific benefit' to the City."[3]  Both also used the derogatory term "Christian clique" to describe Hittle's relationships with other Christian firefighters in the department.

Perhaps most damning to the City's cause is the substance of the lengthy final report the investigator eventually published, forty-seven pages of which were devoted to the allegations pertaining to Hittle's religion. Two of the four "most serious acts of misconduct" described in the report pertained explicitly to the religious nature of the Summit, and its conclusions expressly invoked religion no less than ten different times.

The report echoed Deis's and Montes's concerns that "[t]he City is legally prohibited from contributing to or participating in activities in furtherance of religion" and that

---

[3] These admissions directly contradict other aspects of Deis's and Montes's declarations, where they both assert that the fact that the Summit was a Christian conference was irrelevant to their analysis. They are impossible to square with the above-quoted remarks.  Either the religious nature of the Summit factored into the analysis, or it didn't. The City cannot have it both ways, and at the summary judgment stage, the panel should have credited those portions of the testimony that favor Hittle, not the City.

Hittle's attendance at the Summit was not for "the benefit of the City." At one point, the report even went so far as to say that "[i]t is the concern of the City that the Global Leadership Summit was a *religious based event*."**[4]** After the report was published, the City notified Hittle of its intent to fire him. The notice incorporated the conclusions of the investigator's report, and like the report, it expressly invoked Hittle's religious affiliations and his attendance at the Summit. Hittle was fired soon thereafter.

## B.

Having now reviewed this evidence, it should not be terribly difficult for the reader to see how the record could sustain a reasonable inference that the City fired Hittle at least in part because of his religion, as Title VII broadly defines that term. Montes repeatedly questioned Hittle regarding his religious affiliations and his attendance at a Christian event. On multiple occasions, she demanded that he damper his religious activity with fellow Christians in the workplace. Both Montes and Deis repeated pejorative terms that were clearly intended to be derogatory, and they did so in a manner suggesting they shared the discriminatory feelings of the anonymous agitators in the Fire Department who coined them.

When the City received letters containing even more inflammatory language, Montes again directed her ire at Hittle for being perceived as part of this "Christian Coalition." In the lengthy misconduct investigation that followed, the investigator closely scrutinized Hittle's faith.

---

[4] How much more clearly can one expect the City to state the nature of its concerns, if a statement that begins with, "It is the concern of the City that …" is insufficient?

As the panel previously recognized, but now chooses to ignore, the religious nature of the Summit was the "gravamen" of the investigator's final report. *Hittle*, 76 F.4th at 892. When compared to the "very little" evidence of discrimination a Title VII plaintiff must produce at this stage, *Chuang*, 225 F.3d at 1128, this evidence—much of which is admitted to by the City—more than suffices to create a fact dispute regarding the City's motives for firing Hittle.

Several of our sister circuits have reached similar conclusions in similar cases. In *Venters v. City of Delphi*, for example, the Seventh Circuit explained that "remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality." 123 F.3d 956, 973 (7th Cir. 1997). *Venters* included a few "obvious and compelling example[s]," including "remark[s] to the effect that 'I won't hire you because you're a woman,' or 'I'm firing you because you're not a Christian.'" *Id.* at 972–73. Though the *Venters* court ultimately ruled against the Title VII plaintiff, the remarks in this case—that Hittle was wrong to be part of a Christian Coalition and that a Christian leadership training was of no value to the City—are not meaningfully different from the "obvious and compelling example[s]" discussed in *Venters*.

The Eighth Circuit's decision in *Brown v. Polk County, Iowa*, is even more directly on point. 61 F.3d 650 (8th Cir. 1995). There, Brown, a former county employee "who identifie[d] himself as a born-again Christian," sued his employer, alleging he was fired on account of his religious activities. *Id.* at 652. Before Brown's firing, the county administrator reprimanded him for "participating in

activities that could be construed as the direct support of or the promotion of a religious organization or religious activities utilizing the resources of Polk County Government" and directed him to cease any activities that "could be perceived as to be supporting a religious activity or religious organization." *Id.* at 652–53.

The district court concluded that Brown "had offered no direct evidence that he was fired on account of his religious activities," but the Eighth Circuit reversed, concluding that the "reprimand, which was based on religious activities," clearly demonstrated that religion "was 'a factor' in [the] decision to fire" him. *Id.* at 657. Here, as in *Brown*, there is ample evidence demonstrating that Hittle's religious activities—including his association with other Christians in the Department and his attendance at the Summit—factored into his firing.

In my view, this record is so thoroughly stacked against the panel's framing of this case as to speak with an almost unanimous voice against it. Indeed, there is a strong argument to be made that it is Hittle—not the City—who was entitled to summary judgment here. That the panel continues to ignore such overwhelming evidence in Hittle's favor is a testament to the extent to which it has wholly abrogated its responsibility to view the facts in Hittle's favor.

## III.

Because Hittle introduced direct and circumstantial evidence demonstrating that the City intentionally discriminated against him because of his religion, the panel should have recognized that he had at least created a fact issue as to the City's motives and stopped there. *See Cordova*, 124 F.3d at 1150. It did not do so. Instead, it proceeded forward with an examination of the City's

proffered motives.  In doing so, it not only wrongly invaded the province of the jury, but it also demonstrated a misunderstanding of the Supreme Court's religion caselaw.

In defense of the firing, the City urged—and the panel credited—three "legitimate, nondiscriminatory reason[s]" for its behavior.  *Hittle*, 76 F.4th at 890.  But even assuming the panel should have considered the suggested motives (it shouldn't have), none of them are "legitimate" and "nondiscriminatory," and none of them rebut the evidence Hittle relies on to demonstrate the City's discriminatory intent.  Instead, each of the City's excuses for firing Hittle further reinforces the conclusion that Hittle was fired because of his religious activity, and worse, several demonstrate a deep-set and abiding misunderstanding about its obligations to its religious employees.

## A.

First, the City sought to excuse Montes's and Deis's use of the phrases "church clique" and "Christian Coalition" by reasoning that the insults neither originated with them and nor expressed anything more than concern about the perceptions of others.  The panel credited both these explanations, *see Hittle*, 76 F.4th at 889, but neither satisfies the City's burden of producing a "legitimate, nondiscriminatory reason for the challenged action[]," *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1228 (9th Cir. 2021).

While the derogatory terms might not have originated with Montes and Deis, that does not absolve them of their liability for repeating them.  To support its conclusion to the contrary, the panel relied on *Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2003).  But nothing in *Vasquez* is inconsistent with holding the City liable here.  In *Vasquez*, the plaintiff offered only the discriminatory

remarks of a coworker, not the decisionmaker, and could not "show a nexus between [the coworker's] discriminatory remarks and [the decisionmaker's] subsequent employment decision." *Id.* at 640.

*Vasquez* thus stands for the uncontroversial proposition that remarks must be attributable to the decisionmaker to provide evidence of discriminatory intent. *Id*. That proposition is certainly correct as far as it goes. After all, though they are certainly unfortunate, discriminatory remarks that are not made by an employer and cannot be shown to have motivated the employer's reasoning cannot satisfy a plaintiff's standard of showing that a protected characteristic "was a motivating factor for any employment practice." 42 U.S.C. § 2000e-2(m).

True though it may be, that proposition's application to this case is dubious for the simple reason that *Vasquez* is readily distinguishable. Unlike in *Vasquez*, Hittle's supervisors actually said the discriminatory remarks. And not only did they repeat the discriminatory remarks made by others, but the manner in which they did so also suggests that they were sympathetic to the discriminatory sentiments of those who coined the terms in the first place.

To understand why that must be true, momentarily put yourself into the shoes of a hypothetical black female employee. Imagine that disgruntled employees in your workplace criticized you for being a "diversity hire." If your supervisor scheduled a meeting to discuss those rumors, what would you expect him to say? Personally, I might expect a little sympathy, and maybe even a promise to implement some ameliorative measures designed to root out the hostility. What I certainly *wouldn't* expect is for my supervisor to "express concern" that I was, in fact, a

"diversity hire." The very act of expressing concern about such a thing suggests that your supervisor *agrees* that your status as a so-called "diversity hire" is *the* problem. Of all the things an employer with no intent to discriminate might do during such a meeting, that response must be near the bottom of the list. To put it mildly, that approach certainly wouldn't assure me that my employer was absolutely committed to maintaining a workplace free of race-based discrimination.

The very same inference can be drawn from Montes's interactions with Hittle. On multiple occasions, Montes repeated insults coined by antagonists in the Fire Department, and she did so directly to Hittle's face. When she partook in the name calling, she made it clear that her concern was not for Hittle. She told him he "shouldn't be a part of anything like that as the fire chief" and "should refrain from doing any of those types of activities." This is not the reaction of a supervisor riding to the defense of an employee being subjected to discriminatory workplace name-calling. Quite the opposite. Ultimately, it is hard to view Montes's behavior as anything other than an expression of her own disapproval that Hittle was acting too Christian at work. The same can be said of Deis's use of the phrase "church clique."

For the same reasons, the panel was also wrong to conclude that Montes and Deis were merely "show[ing] concerns about other persons' perceptions." They clearly had their own concerns and borrowed the derogatory language of others to voice them. But even assuming for a moment that Montes and Deis were only voicing the "perceptions" of others (and again, at this stage of the litigation, we cannot assume they were), those "perceptions"

do not provide a legitimate excuse under Title VII because they are themselves blatantly discriminatory.

Although the City argues to the contrary, the anonymous antagonists in the Fire Department were doing more than just "express[ing] unhappiness over Hittle allegedly engaging in favoritism." *Hittle*, 76 F.4th at 888. The letters the City received referred to Hittle as a "religious fanatic" and to his attendance at the Summit as a "gross misuse of city finances." These accusations must be examined against the backdrop of anti-Christian hostility in the Fire Department, where phrases like "Christian Coalition" and "Bible Thumpers" were commonly leveled against religious employees in a condescending fashion. These facts make it sufficiently clear that the "perceptions" that so concerned Montes and Deis were far from nondiscriminatory. For that reason, they cannot possibly be the subject of any legitimate concern that might excuse their behavior. Thus, even if it is true that Montes and Deis were merely "show[ing] concerns about other persons' perceptions," that does not inoculate the City from their discriminatory taint.

Though the Supreme Court has not yet squarely addressed this issue in the context of a Title VII intentional discrimination claim, it has elsewhere made clear that religious activity cannot be censored in service of the discriminatory and misplaced perceptions of others. In *Kennedy*, for example, the Court explained that "the Establishment Clause does not include anything like a 'modified heckler's veto, in which … religious activity can be proscribed' based on 'perceptions' or 'discomfort.'" 597 U.S. at 534 (quoting *Good News Club*, 533 U.S. at 119). More recently, in *Groff v. DeJoy*, it explained that neither "a coworker's dislike of 'religious practice and expression in the workplace'" nor "animosity to a particular religion [or]

to religion in general" can excuse a public employer's failure to accommodate an employee's religious activity. 600 U.S. 447, 472–73 (2023).

The Eighth Circuit encountered a similar explanation from a public employer in *Brown*. *See* 61 F.3d at 656–57. There, Brown's employer sought to defend its decision to fire him by noting that Brown's religious activities had become "a point of conversation" in the workplace and "that 'some people … were concerned' about the possible effect of [his] religious beliefs on his personnel decisions." *Id.* The Eighth Circuit considered these explanations insufficient, however, because the employer had not demonstrated that the concerns expressed by Brown's coworkers "were either reasonable or legitimate." *Id.* at 657. So too here.

The panel's reasoning is not just wrong, but it also has the potential to create pernicious jurisprudential consequences for all Title VII plaintiffs, not just religious ones. By downplaying Montes's behavior as nothing more than expressing "concerns about other persons' perceptions," the panel has created a massive loophole to the general rule that "discriminatory remarks … create a strong inference of intentional discrimination," *Mustafa*, 157 F.3d at 1180. If all an employer must do to escape the inferential force of a discriminatory remark is merely later state that he repeated the remark out of concern for others' perceptions, then the "strong inference" must not be that strong after all. The panel's rule, which is willfully blind to the possibility that discriminatory employers might seek to hide behind other discriminatory employees, creates a *de facto* license for employers to repeat whatever insults an employee's coworkers make—so long as they let the coworkers do the dirty work of devising them first. This cannot be the rule.

Consider how such a rule might apply in light of recent world events.  To do so, imagine a hypothetical workplace with many Jewish and Palestinian employees.  The Palestinians decry their Jewish colleagues' connections to a supposed "Zionist Conspiracy" in the office.  Would this court permit an employer to "express concern" about the existence of the so-called "Zionist Conspiracy" so long as that term was first coined by a Palestinian coworker?  Or to recall some earlier examples, would it consider others' perceptions that an employee was a "diversity hire" or the member of a "Rainbow Coalition" to be legitimate bases for criticizing the employee's status?

Of course not, and rightly so.  In these hypotheticals, both the terms themselves and the fact that they are being raised as "concerns" *about the employee* in the first place are compelling evidence that some form of discrimination is afoot.  The same is true here, and a rule that blesses Montes's use of the phrase "Christian Coalition" immunizes an employer who repeats the phrases "Zionist Conspiracy," "diversity hire," "Rainbow Coalition," or any number of similarly derogatory labels with equal force.

## B.

Second, though the City never mentions the Establishment Clause by name, it sought to avoid an inference of discrimination by invoking vague notions of avoiding the endorsement of religion.  Montes, for example, asserted that "[i]t was improper for Chief Hittle to attend a religious training event on City time using City property because the City is not permitted to further religious activities."  Deis expressed similar concerns.  For its part, the panel accepted these "concern[s] that the City could violate

constitutional prohibitions" in this way as "legitimate." *Hittle*, 76 F.4th at 889.

But if there was any room for such thinking before the Supreme Court's recent decision in *Kennedy*, there certainly isn't now.  Because this court is *very* familiar with the facts of *Kennedy*, I'll stick to the basics.  In *Kennedy*, a high school football coach who prayed on the field after his team's football games was disciplined by his employer, Bremerton School District.  597 U.S. at 514.  Like the City of Stockton, Bremerton acted on its "mistaken view that it had a duty to ferret out and suppress religious observances" by public employees, *id.* at 543, forbidding Kennedy's on-field prayers to avoid violating the Establishment Clause by appearing to endorse Kennedy's faith, *id.* at 532.

The Supreme Court was unconvinced by Bremerton's Establishment Clause logic.  It unequivocally rejected its endorsement concerns, finally putting the "abstract," "ahistorical" "*Lemon [v. Kurtzman]* and its endorsement test offshoot" to rest.  *Id.* at 534.  As the *Kennedy* Court explained:

> An Establishment Clause violation does not automatically follow whenever a public school or other government entity "fail[s] to censor" private religious speech.  Nor does the Clause "compel the government to purge from the public sphere" anything an objective observer could reasonably infer endorses or "partakes of the religious."

*Id.* at 534–35 (citations omitted).

What was true in *Kennedy* is true here. Montes's conclusion that Hittle must not associate with other Christians in the Fire Department or attend a Christian conference because of concerns that the City "is not permitted to further religious activities" reflects nothing more than fear of a "phantom constitutional violation[]." *Id.* at 543. It supposes a standard of secular scrupulosity that the Establishment Clause does not and has never required of public employers. *See Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1213 (9th Cir. 1996) ("There is simply no legitimate basis for … an order prohibiting all advocacy of religion in the workplace on the ground that it is necessary to avoid the appearance that the state is favoring religion."); *see also Brown*, 61 F.3d at 657 (rejecting employer's claim that the "[E]stablishment [C]lause allows them to prohibit religious expression altogether in their workplaces" as "too extravagant to maintain"). Because the City has no legitimate interest in suppressing all religious activity in its workplaces, Montes's concerns cannot possibly provide a legitimate basis for Hittle's firing.

Deis's concerns about the use of public funds are similarly illegitimate. The Supreme Court has repeatedly rejected the notion that establishment concerns allow governments to "discriminate[] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017); *see also Rosenberger*, 515 U.S. at 842–43. In *Trinity Lutheran*, Missouri sought to "categorically disqualify[] churches and other religious organizations from receiving grants under its playground resurfacing program" given its "antiestablishment objection" to supporting religion. 582 U.S. at 454, 463. Even though the case concerned only the

denial of grant funding, not a prohibition of Trinity Lutheran's rights to worship, the Court nevertheless concluded that Missouri's reasoning, which singled out the church "solely because it is a church," could not justify its discriminatory behavior. *Id.* at 463.

Deis's conclusion that Hittle was wrong to use public funds to attend the Summit was undoubtedly predicated on his conclusion that the Summit was a religious-affiliated organization offering leadership training from a religious perspective. It thus rests on the same wrong logic rejected in *Trinity Lutheran*. Like Trinity Lutheran, Hittle was categorically excluded from a benefit—the privilege of choosing leadership training uniquely suited to his personal and professional circumstances—solely based on religion. He was later denied his job for his religious activity. Such discrimination infringed on his rights under Title VII with as much force as Missouri violated Trinity Lutheran's free exercise rights.

As a department head, Hittle had the authority to approve his own attendance at a training or conference. By Montes's own admission, attending conferences during work hours would not have been unusual for employees like Hittle, as "the City was not concerned that he was away from the Department for the two days." From that we can conclude that the benefit—selecting leadership training—was widely available to people in Hittle's position. What the City *was* concerned about, however, was the conference's religious perspective. Had the Summit been offered from a secular viewpoint, the City would have had no problem with Hittle's attendance. But instead the Summit was a Christian event, and as far as the City was concerned, therein lies the rub. That reasoning is inherently discriminatory, and the Establishment Clause does not require it. The court should

have taken this opportunity to hold en banc that Title VII affirmatively prohibits it.

Although the Supreme Court's religion cases have decisively rejected *Lemon*'s endorsement test and swung in favor of religious accommodation and toleration, the panel in *Hittle* nevertheless considered the City's endorsement concerns "legitimate" and "non-discriminatory." They are neither. Such concerns are only "legitimate" if the City has a discernible interest in avoiding an incorrect perception of the endorsement of religion. As *Kennedy*, *Groff*, and *Trinity Lutheran* make clear, it does not.

C.

The City's third and final purported "nondiscriminatory" basis for invoking Hittle's religion as a basis for his firing proceeds from the same basic misunderstanding as its second. The City argued that it viewed Hittle's attendance at the Summit as problematic not because it was religious but because of its "lack of benefit to the City." *Hittle*, 76 F.4th at 889. While that reason sounds neutral and nondiscriminatory enough, it again misconstrues the record in favor of the City and conceals the fact that the very reason the City considered the Summit of no benefit to it—because it provided leadership training from a religious perspective—was fundamentally discriminatory.

To begin with, the City can only plausibly advance this explanation by again playing games with the record. It attempts to reframe the basis of its conclusion that the conference was of no value away from the Summit's religious nature and toward its assertions that (1) the Summit was not specific to Fire Chiefs or "designed for the upper management of public entities" and (2) Hittle could not articulate a specific benefit to the City. Montes, for example,

asserted in her declaration that "[t]he fact that the Summit was religious based, of itself, was not an issue at all." Deis made similar statements, contending that "[i]t was irrelevant to [his] analysis that this event was religious themed."

The panel accepted the City's reframing of the issue, *id.*, but it was wrong to do so for at least three reasons. First, and most importantly, Montes's and Deis's assertions are contradicted by their other statements, which tie the asserted lack of benefit to the Summit's religious mission. Courts are not at liberty to accept self-contradicted testimony favoring a movant at the summary judgment stage.

Second, Hittle has also provided evidence contradicting the City's framing of the events. As explained above, Hittle contests the substance of Montes's instructions. He also provides an account of the lessons he learned at the Summit. Even though the Summit was not designed *only* for public sector leadership, these facts plausibly demonstrate how the training might appreciably improve Hittle's leadership skills generally, thereby providing the City a benefit. The panel was again wrong to credit the City's version of the facts at the summary judgment stage.

But finally, even if Montes's and Deis's testimony hadn't been contradicted by Hittle or their own declarations, the Supreme Court's decision in *Bostock v. Clayton County* instructs courts not to accept an employer's characterizations of its own motivations at face value and to instead scrutinize whether the employer's actions were discriminatory. *See* 590 U.S. at 668 ("[N]othing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond [the] discrimination.").

Consider again that portion of the City's reasoning the panel should have credited at this stage. Montes explained

that the Summit was "inconsistent with … policies that require that the training provide 'a specific benefit' to the City" because of its "stated purpose" "to 'transform Christian leaders … for the sake of the local church." The import of such reasoning is unavoidable. It clearly and unmistakably ties the lack of benefit to the religious character of the training. As far as the City of Stockton is concerned, a training espousing Christian leadership principles has no "specific benefit" to offer its employees.

There's just no way around it: such logic is per se discriminatory. To borrow from the introductory hypothetical, if Montes had fired a fire chief for attending an LGTBQ-focused leadership training on the basis that LGBTQ events never offer any "specific benefit" to the City, that firing would clearly rest on discriminatory criterion. The same could be said if the leadership training had focused on employees of a specific race, sex, or nationality. And because Title VII plainly includes religion alongside these protected classes, the same must be true here.

As the Supreme Court has repeatedly held, government entities cannot hold out religious individuals or organizations for unfavorable treatment solely on account of their religious viewpoints. *Groff*, 600 U.S. at 472; *Kennedy*, 597 U.S. at 543–44; *Trinity Lutheran*, 582 U.S. at 462; *Good News Club*, 533 U.S. at 120; *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 769 (1995); *Rosenberger*, 515 U.S. at 845; *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993); *Widmar v. Vincent*, 454 U.S. 263, 277 (1981). Just like its first two reasons, the City's third reason is far from "legitimate" or "nondiscriminatory."

* * *

Though the excuses the City offers for the firing are all clothed in neutral language, they ultimately do nothing to rebut the conclusion that the City intentionally discriminated against Hittle because of his religion.  Both the City's behavior and the panel opinion rest on the oft-repeated but thoroughly debunked idea that there is something inherently suspect about public employees integrating their religion into their work.

For the reasons explained above, the panel's operative principle is constitutional fiction.  It cannot be squared with the core truth that the government need not and cannot discriminate against its religious employees to fulfill its obligations under the Establishment Clause.  We must stop allowing government entities to express their hostility toward religion by vaguely alluding to the endorsement boogeyman.  And as another judge on this circuit aptly put it, "[t]he way to stop hostility to religion is to stop being hostile to religion."  *Kennedy*, 4 F.4th 910, 945 (9th Cir. 2021) (R. Nelson, J., dissenting from the denial of rehearing en banc).  In its own opinion in *Kennedy*, the Supreme Court agreed.  I'm not sure how many more times the Court will have to repeat itself before this court gets the message, but apparently it still hasn't sunk in.  Until it does, we are doomed to repeat the kinds of errors our court unfortunately blesses today.

## IV.

To complement its errors regarding the evidence of the City's intent to discriminate and its treatment of the City's supposed "legitimate" and "nondiscriminatory" reasons for firing Hittle, the panel made two more critical missteps. First, it misunderstood and misapplied Title VII's

"motivating factor" standard for liability. And second, in its original opinion, it incorrectly heightened a Title VII plaintiff's standard of proof. Each of these errors is independently sufficient to warrant rehearing, and taken together with the panel's many other errors, they cried out for en banc correction.

## A.

First consider the panel's causation analysis. The City advanced—and the panel recounted—a number of other examples of Hittle's misconduct that supposedly explained his firing. *See Hittle*, 76 F.4th at 881–82, 892–93. The panel thought it relevant that "the City articulated an overwhelming number of other non-discriminatory reasons for terminating Hittle's employment." *Id.* at 892 (cleaned up). But that too was error. When an illegal employment criterion at least partly motivates the decision to fire an employee, it does not matter that the employer was motivated by other legitimate and nondiscriminatory criteria as well.

That is because Title VII includes two separate causation standards, each sufficient to establish an "unlawful employment practice" under Title VII. The first, premised on Title VII's core provision making it illegal to "discriminate … because of … religion," 42 U.S.C. § 2000e-2(a)(1), incorporates "the traditional but-for causation standard." *Bostock*, 590 U.S. at 656. But Congress also codified a separate and "more forgiving," *id.* at 657, standard at 42 U.S.C. § 2000e-2(m), which provides that "an unlawful employment practice is established when the complaining party demonstrates that … religion … was *a motivating factor* for any employment practice, even

though other factors also motivated the practice" (emphasis added).

As the Supreme Court explained in *Bostock*, "a but-for test directs us to change one thing at a time and see if the outcome changes." 590 U.S. at 656. "Often, events have multiple but-for causes," and "[w]hen it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to the challenged employment decision." *Id.* Here, by privileging the City's "other nondiscriminatory reasons" that supposedly justified Hittle's firing, the panel flouted *Bostock*'s explanation of the but-for causation standard. We know that Hittle's Summit attendance was one but-for cause of his firing for the very simple and unassailable reason that the City has told us so. It expressly referenced the Summit in at least two of the ten reasons it provided in its notice. And even more compelling than that, the investigator's report very specifically noted that "[i]t is the concern of the City that the Global Leadership Summit was a *religious based event.*" Given these undisputed facts, the analysis should have been very simple: Because "plaintiff's [religion] was [at least] one but-for cause of that decision, that is enough to trigger the law." *Id.*

But even if Hittle could not meet the but-for causation standard, he is certainly able to show that the Summit was "a motivating factor" in his firing. The panel's reliance on the City's other motives is reminiscent of the Supreme Court's now abrogated ruling in *Price Waterhouse*, where a plurality held that a "defendant may defeat liability by establishing that it would have made the same decision even if it had not taken the plaintiff's race (or other protected trait) into account." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 337 (2020) (citing *Price Waterhouse*

*v. Hopkins*, 490 U.S. 228, 246 (1989)).    But *Price Waterhouse*'s reasoning did not stand for long.    After Congress "displaced *Price Waterhouse* in favor of its own version of the motivating factor test," *id.*, it now "suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).    So even if the City had other lawful motives to fire Hittle—which Hittle disputes—those motives do not displace its unlawful consideration of Hittle's Summit attendance.    The panel erred by suggesting otherwise.

## B.

Finally, the panel's original opinion seriously erred in its description of what kind of evidence is sufficient to state a Title VII claim by (1) requiring Hittle to show that his firing was "motivated by religious hostility" instead of a mere intent to discriminate and (2) demanding that a decisionmaker's remarks "be 'clearly sexist, racist, or similarly discriminatory' to create an inference of discriminatory motive." *See Hittle*, 76 F.4th at 890, 892.

As to the panel's original suggestion that an employer must be motivated by hostility for a firing to constitute actionable discrimination, the Supreme Court plainly and forthrightly disagrees.    In *Watson v. Fort Worth Bank & Trust*, for example, it explained that a Title VII plaintiff need only demonstrate "that the defendant had a discriminatory *intent* or motive."    487 U.S. 977, 986 (1988) (emphasis added).    And more recently, in *Bostock*, the Court formulated the rule as follows: "[A]n employer who *intentionally* treats a person worse because of [a protected characteristic] …

discriminates against that person in violation of Title VII." 590 U.S. at 658. Until the panel's decision here, our precedent was in alignment with the Supreme Court's standard. *See Costa*, 299 F.3d at 854 ("Disparate treatment claims require the plaintiff to prove that the employer acted with *conscious intent to discriminate*.") (emphasis added).

While ill will, bias, or hostility will certainly do the trick, *see Cordova*, 124 F.3d at 1149, one can act with an intent to discriminate without an inkling of ill will toward a protected class—and even with an "ostensibly benign" purpose in mind. *Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am., UAW v. Johnson Controls*, 499 U.S. 187, 188, 198 (1991); *see also City of Los Angeles, Dep't of Water & Pow. v. Manhart*, 435 U.S. 702, 707 (1978) (disallowing policy premised on an "unquestionably true" "generalization" that "[w]omen, as a class, do live longer than men" even though the policy displayed no hostility toward women); *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 543 (1971) (rejecting policy even though "no question of bias against women … was presented"). The panel's decision, which conflated "discriminatory animus" with "hostility," is a stark outlier by comparison.[5]

The panel also invoked this court's decision in *Coghlan v. American Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir.

---

[5] The panel's confusion, though serious, is certainly understandable. After all, in everyday parlance, one who acts with "animus" is often understood to harbor hostility or ill will rather than a mere intention. Dictionary definitions bear this common understanding out. While Black's Law Dictionary's second definition of "animus" is "intention," its first definition of the word is "ill will; animosity." Our circuit's use of the phrase "discriminatory animus," while doctrinally consistent with the Supreme Court's use of the same phrase, is confusing and invites the type of error originally made by the panel.

2005), for the proposition that "discriminatory remarks made by a decisionmaker *must* be 'clearly sexist, racist, or similarly discriminatory' to create an inference of discriminatory motive." *Hittle*, 76 F.4th at 891 (emphasis added). That again misreads our precedent, as *Coghlan* says no such thing. Rather, it says only that "[d]irect evidence *typically* consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan*, 413 F.3d at 1095 (emphasis added). That's a big difference.

Now, the panel responds to these significant errors by attempting to paper over them in its amended opinion, all while reaching the same incorrect result it reached before. Its amendments scrub any reference to the term "hostility" from the opinion and substitute in the term "discriminatory animus." Tellingly, it also recharacterizes the investigator's focus on religion, which it previously referred to as the "gravamen" of the report, as now nothing more than an "aspect" of that document. It's worth making a few observations about the panel's supposed fixes.

First, even if replacing the word "hostility" with the phrase "discriminatory animus" might fix the opinion's description of the intentional discrimination standard from a doctrinal perspective, that does nothing practical to clarify the state of our law, flag the reasons for the panel's mistake, or prevent a future panel from repeating the same error. As explained above, the term "discriminatory animus" is confusing and has the potential to invite error. And since the panel now uses the phrase "discriminatory animus" to replace its former use of the word "hostility," without explaining that it does not actually mean "hostility," this revised decision will only add to the risk that future panels make the same mistake.

Second, the amendments do not fix the panel's other incorrect statement that discriminatory remarks "must be 'clearly sexist, racist, or similarly discriminatory' to create an inference of discriminatory motive." As previously explained, that overreads *Coghlan*, and it is simply not the standard in this circuit. Given that the panel's amendments leave this and many other errors uncorrected, the court should have taken this case en banc, where it would have been able to provide more helpful guidance about what "discriminatory animus" means. It should not have left such an important issue to be addressed by a few ambiguous changes in verbiage issued quietly in an amended opinion.

Third, the panel makes an unexplained and indefensible change to its position regarding the centrality of religion to the investigator's report. In the original opinion, the panel acknowledged that religion is the "gravamen" of the report—because it obviously is. But it claimed that didn't matter to the outcome of the case because Montes and Deis had not displayed any hostility to Hittle's religion. Now, in the amended opinion, where the panel has no "hostility" standard to fall back on, religion is suddenly relegated to merely an "aspect" of the report—and moreover, an aspect that apparently played no role in his firing.

The panel sneaks this change into its opinion alongside its other clarifying amendments, but this move is obviously much more than a mere clarification. It's an about-face on a key issue of fact, and in the absence of the more demanding "hostility" standard of disparate treatment liability, it is an about-face that is critically necessary to maintain the current disposition in favor of the City. After all, if (1) religion was the gravamen of the report, (2) the decision to fire Hittle was based on the report, and (3) all that Hittle is required to show was that he was "intentionally treat[ed] … worse because of"

religion, *Bostock*, 590 U.S. at 658, then the religious "gravamen" of the report is a dispositive factual finding in favor of Hittle. The panel provides no justification for its convenient epiphany regarding the proper reading of the report, and one could be forgiven for concluding the move is results oriented.

The strategic nature of the panel's amendments magnifies the need for en banc review. If the court is going to make adjustments of this significance to the nuts and bolts of a high-profile opinion, it should have done so directly. It should have squarely repudiated the panel's prior flawed reasoning in an en banc opinion instead of allowing the panel to mask its most obvious mistakes behind a few unassuming changes of verbiage. For this and the many other reasons described above, we should have taken this case en banc.

## V.

This is not the first time this court has refused to rehear a case in which a government employer has sacrificed its employees' religious rights in an ill-advised effort to satisfy the supposed requirements of the thoroughly repudiated endorsement test. *See Kennedy*, 4 F.4th at 911. And given our court's refusal to address this mistake en banc, it likely will not be the last. In this latest effort, Title VII has now become collateral damage in our crusade against "acting Christian" in public workplaces. I shudder to think about what area of caselaw we might distort next. Even though the "ghoul" of the endorsement test has now been "repeatedly killed and buried," *Lamb's Chapel*, 508 U.S. at 398 (Scalia, J., concurring in the judgment), one could be forgiven for concluding that the reports of its death are greatly exaggerated—at least out here on the Left Coast.